FORT PIERCE BANK & TRUST COMPANY, *Plaintiff in Error,*
v. E. E. SMITH, *Defendant in Error.*

146 So. 225.

Opinion filed February 17, 1933.

*F. L. Hemmings,* of Fort Pierce, Attorney for Plaintiff in Error;

*D. C. Smith,* of Fort Pierce, and *W. A. Pattishall,* of Orlando, Attorneys for Defendant in Error.

BARNS, C. J.—This is an action by E. E. Smith against the Fort Pierce Bank & Trust Company (hereinafter referred to as the "Bank"), upon a promissory note made by Mr. Moody to the Bank, and by said Bank negotiated to the plaintiff before maturity. The note was secured by a mortgage upon the land of Moody.

After the note was considerably past due and with Moody unable to pay, negotiations between Smith and Moody began. It is admitted that Moody made, executed and delivered a warranty deed of the mortgaged property to Smith, the deed containing the following:

"Subject to taxes and improvement liens. Also subject to mortgage given to Fort Pierce Bank and Trust Company."

The declaration was in the regular form, and pleas were filed setting forth the mortgage as security to the note and the assignment of same to the plaintiff, and

"That afterwards, but prior to the commencement of this suit, the said Troy E. Moody and Margaret P. Moody, his wife, who at the time were the owners in fee simple of said mortgaged real estate, conveyed said mortgaged real estate to E. E. Smith, the plaintiff, in full satisfaction of the amount due by virtue of said note and mortgage, and the said E. E. Smith accepted said deed in full satisfaction of said indebtedness. Wherefore, this defendant says that the amount of indebtedness evidenced by said promissory note has been fully paid, and this defendant has been released and discharged of and from all liability on said promissory note as indorser thereof or otherwise."

To this plea the plaintiff filed his replication setting forth the date of the note, its maturity, the payments thereon and the default of the maker, and that

"Said mortgagors expressed a desire to pay same if it were possible at all and offered to give Plaintiff a deed to said premises, in order that he could attempt to find a purchaser for the same and in that way get what he could out of the premises and in case he should find a purchaser for the same, he would then be in a position to make a ready conveyance and in turn apply whatever he might realize out of said sale on the mortgage indebtedness and said mortgagors would pay the balance; that in accord with such offer said mortgagors on the 9th day of September, A. D. 1929, executed a warranty deed covering said premises to the Plaintiff, such deed containing an express provision that it was made subject to said mortgage and the physical possession of said deed was given to the Plaintiff and has been held by him for the purpose for which it was given, as above stated; that the said deed has never been recorded in the Public Records of St. Lucie County, Florida; that the Plaintiff never intended that said mortgage indebtedness owned by him should be merged upon the making of such deed and that he has never expressed any such intention in any manner or means; that he continues to hold said note and mortgage and the same have not been cancelled and delivered to said mortgagors and satisfied of record, but that the same remains unpaid as stated in the Declaration; that the Plaintiff has never exercised any acts of possession over said premises or received any benefit of any kind whatsoever from the same and the Plaintiff has been unable to effect a sale of the same.

"Wherefore, the Plaintiff says that the indebtedness evidenced by said note and mortgage has not been paid and

that the Defendant and said mortgagors have not been released and discharged from liability on same."

Such were the issues and the verdict was for the plaintiff. Substantial portions of Moody's testimony are that:

"Mr. Smith asked me if I would give him the title to the property he would see if he could sell it and I told him I would. It rocked on and for some reason I overlooked it and Mr. Smith asked me the second time if I had it fixed up and I told him no, but I would fix it up, which I did, and Mr. Smith came back and I delivered the deed to him, which, in itself, was conveying the title to Mr. Smith who was holding the mortgage on this property.

"Q. Did you ever have any agreement with Mr. Smith as a reason for giving him that deed?

"A. Certainly. I was giving him the deed because I couldn't pay him for the property, and I was giving him the title to it to save him the trouble of foreclosing the mortgage and spending that much money on it * * *.

"A. Mr. Smith came to me and made the statement that he was badly in need of money and that he would be willing to accept half of this mortgage price for the note and I told him I didn't have it, but that I thought the property was worth it and he could possibly get that for it and maybe more, and he said, if he had it he would see if he could sell the lot and asked if I would give him a deed to it, and I said I would. As I stated a minute ago I overlooked it for some reason and Mr. Smith asked me the second time if I had the deed ready. I told him I didn't have it ready, but I would fix it up immediately, and Mr. Smith came back and I delivered the deed to him * * *.

"We had an understanding—the understanding was that Mr. Smith was badly in need of funds and he was willing to accept fifty per cent. of this amount for his indebtedness

and thought he could get it out of the property if he had title, and I conveyed him the title, and in the deed reciting subject to all encumbrances on the date that Mr. Smith ac-·cepted it, with the understanding that I was released from my obligation * * *.

"My office was at Vero at that time; the same office in which I still do business. It is an abstract company. That has been my business for some time, and it was at that time; that's where I work, if that's what you mean. I testified on direct examination that it was my understanding that I was being relieved of all liability on that note, and I based that understanding on the conversation that I had with Mr. Smith, and certainly I felt that he could take title to the lot and regardless of the amount he got out of it I certainly wouldn't be further interested in it."

It is further evident that Mr. Smith tried to sell the property and in negotiating with other parties referred to it as his own, and collected payments from the Bank after the delivery of the deed and that the Bank knew nothing about the deed from Moody to Smith. The substantial portions of Smith's testimony are that

"As to whether Mr. Moody said anything to me regarding the payment of the interest and the note, that is, expressed a desire to pay—when the first payment became due why he said that he couldn't meet it just at that time, but that he hoped to shortly, and kept on saying that he expected to pay it for some little time and finally merged into the statement that he was simply unable to pay; that he didn't have the money. As to whether Mr. Moody stated any way that I might be able to realize some actual money on the deal—a considerable time after that the interest payment and such was discussed for some length of time and in the meantime the principal became due also and I kept seeing him at different times, and then he—of course the natural.

result was if he couldn't pay the interest he couldn't pay the principal either, and he expressed a desire to help in any way at all that it was possible for him to help realize some money for me on the transaction, and finally expressed a willingness to sell the lot, to co-operate in an effort to sell the lot at that time, yet we believe the lot was worth the face of the note and tried to ask it—tried to get that amount. I was referring to Mr. Moody and I when I said 'we tried to sell the lot.' I have every reason to believe that Mr. Moody tried to sell the lot after this conversation which I have referred to. Neither Mr. Moody or myself succeeded in finding a purchaser for the property. As time went on we dropped in the price in an effort, and the first time we discussed the list price on the face of the note he said we would have to take less than that price, and he meant, and was willing, to make up any deficiency that would occur from the sale—any loss that I would have to sustain; that he meant to repay, or pay that just as soon as he was able. He made that statement a number of times. As to whether Mr. Moody ever suggested or stated that he would give me a deed to the property—he did; the first time that the deed was mentioned was the time that I stopped at his office and we were discussing the possibility of getting money, and he made the statement that he was willing to do anything in his power to help realize some money on it. I was badly in need of money and he said that he realized the fact that I had waited much longer than he had a right to expect, and he was willing to do anything to assist or help in the sale. He said 'I will give you a deed if you think that will do you any good.' And in the same sentence, or following sentence, and he reiterated that statement before, 'if we can sell it—if it brings less than the face of the note, I will make good the balance on the principal and interest myself.'

"He sent me a deed to this property. It was sometime afterward—I didn't express any desire to have the deed the first time he offered it, but later someone suggested to me that it was possible that a deed would help in the sale and asked me whether I had one—just in conversation, and I said, 'No, but Mr. Moody offered me one to help—if it would be any help in making a sale, and on my way home from Fort Pierce here I stopped at Vero and called his attention to it, and that we had spoken sometime ago—and he had expressed a willingness to make me a deed, and I had decided there might be some advantage in making me one and he said he would make me one right away and send it to me. Mr. Moody made the suggestion that he would be glad to give me a deed to the property before I stopped and asked him for the deed—but I didn't ask him for the deed in the beginning. The second time I was there, then I asked him to make the deed. This deed came to me in the mail. (Counsel handing witness paper.) This is the deed that Mr. Moody sent to me * * *.

"I testified that this deed was sent to me by mail. It was my intention that this deed was being sent to me simply to facilitate the sale of the property; that was Mr. Moody's own suggestion. It was not my intention that when Mr. Moody and his wife executed this deed that the debt which Mr. Moody owed me was paid. It was my intention, if I failed to realize the full amount of his obligation to me out of the property, to look to him for any balance on the deficiency; and that is the repeated statement that he expected to do that. I absolutely did not tell Mr. Moody on any occasion that I considered the deed discharged and satisfied the debt * * *.

"I have never considered, nor has it ever been my intention that the debt which is represented by the note that is now being sued upon has been paid. The note has not been paid.

As to what my intention was as to the giving of the deed—as stated before it was given simply to—as a possible aid in making the sale which was understood by Mr. Moody and I—because he offered it for that purpose * * *.

"My idea of this arrangement with Mr. Moody is different from his; decidedly so. Yes, my idea is that Mr. Moody gave me that deed so as to facilitate a sale. And upon the sale being made I was to give him credit for the amount realized from the sale, and charge him the balance.

"The reason for my arrangement with Mr. Moody that when the lot was sold I would give him credit for that amount, was a bit of use, in foreclosing on Mr. Moody, as there wasn't any prospect of getting anything from him at that particular time. That's the reason I made that arrangement, and with his suggestion that we do make it. The cut in price was always conditioned on getting money at that particular time."

### As to Assignment of Error No. 1.

The additional plea tendered by the defendant was to the effect that the obligee Smith and Moody had modified the contract on which the Bank was surety (without the Bank's ratification) and had thereby released the Bank from liability as endorser.

The plea was presented after all the evidence was in and there is not sufficient evidence to support said plea, therefore it was not error to have refused leave to file same.

### As to Assignment of Error No. 2.

Assignment of error numbered two is based upon the refusal to charge the jury that the substance of the additional pleas as tendered was a good defense to the action, and for the same reasons to those above given as to the assignment of error numbered one, we hold such assignment of error

must fail. Neither the testimony of Smith nor Moody supports it.

*As to Assignment of Error No. 3.*

Assignment of error numbered three goes to the failure of the lower court to grant a new trial. We find no error here.

If Smith took the property with the agreement between Moody and himself that Moody was to be released of his obligation, or that the debt was to be thereby paid and discharged, then the plaintiff's cause of action must fall. The jury found such not to be the agreement. The words of the deed referring to the mortgage and taxes are insufficient without other facts to impute a promise by the grantee to the grantor to assume the encumbrances named. There were exceptions here to the full covenants of warranty.

Affirmed.

DAVIS, C. J., and WHITFIELD, TERRELL and BUFORD, J. J., concur.